Corporation, Mr. Bittner. May it please the Court. Appellate, Mr. Bittner, is a defendant. I have three argued cases this morning. The first is 17-1548, Equistar Chemicals, LP v. Westlake Chemical Corporation, Mr. Bittner. I want to bring two issues before the Court today. First, that we are entitled to judgment as a matter of law on the issue of infringement based on the overwhelming weight of the evidence. And second, that Westlake defendant, Appellee, should be relieved of the verdict of non-infringement they obtained based on misrepresentations of fact presented to the jury by their expert. I'll briefly address the first before turning to the second. At trial, only one limitation was disputed. Only one, and that was... You have all the documents that you say support your claim of misrepresentation before trial, right? That is correct, Your Honor. And you used them at the trial? We used some of them, Your Honor. Well, if you didn't use the others, that was up to you, right? There were some documents that were the proverbial needle in the haystack, that it would not have been fair to expect us to find in the middle of a one-week-long trial based on factual representations brought by their expert that he had never previously disclosed. You mean it's newly discovered evidence because you didn't find it in the stuff that was given to you earlier? Not at all. Their expert brought up misrepresentations of fact during trial that had never been disclosed. He was never going to... He had never told us during his expert reports or during expert discovery or any discovery in the case that he would represent the jury. And those were twofold. Let me get into those. The first one was that he had verified that the one day's data that they selected to present to the jury, that day was April 23rd, 2014. He stated he verified to the jury that that data was representative of their process and all the other documentation that he looked at the night before. The way this came up is the day previous, on Wednesday of trial, it came out that the one day they selected, and they testified they could have selected any day, the one day they selected, something was, quote, very wrong with the plant that day. They were having some, quote, unusual troubles. Well, the court actually looked both at the question of whether or not you had a fair opportunity to cross-examine on this topic and looked at the question of whether the data really was as different as you claim, and the court concluded that you went on neither ground, right? On the temperature, I believe the court didn't conclude that. We believe the court concluded that incorrectly. But that's an evidentiary determination, right? Are we supposed to go back and look at these things de novo and make those kind of factual assessments? No, it is an abuse of discretion standard under Rembrandt and Foucault. But you're really asking us to make a credibility determination that we misrepresented something. I don't believe so, Your Honor. There are statements, verifiable statements of fact, whether or not that data was representative. That data is a statistical outlier. They try to excuse that by saying there are about three or four worse days we could have selected of all the days there were. Let me get to the second manner in which the expert misrepresented facts to the jury. Not only did he say the data was correct, he then went a step further and said the product that day was good product, quote, good product, that it met specifications. And moreover, it was shipped to a very demanding customer, later called in his testimony a very discerning customer. That customer he identified as Kerwood. This had never been disclosed to us. You just cross-examine him on that. You just say no one ever told us that Kerwood was very demanding or very discerning. How can you say that this is true when you never disclosed that fact in the past? I don't get this. This is just not having analyzed the record enough to be sufficiently prepared to cross-examine your expert. It wasn't a matter of cross-examining the expert on whether or not Kerwood was or was not a discerning customer. It's we couldn't have been prepared to look through the millions of documents to find the one page that says that shipment didn't go to Kerwood. The product made that day on April 23, 2014 did not meet Kerwood's specifications. Kerwood would not accept products with what's known as a black speck level. It's degraded or burnt material. It happens when the mixture is too hot. Would not expect black speck material above a quantifiable measure of one. There were measurements that day that were above one, above two, above four, and even above five. In millions of pages of documents, we had no way to expect fairly that he was going to bring a disclosure never previously known to us that this product went to Kerwood and be able to comb through millions of pages to find the one page that said that product made that day did not meet Kerwood's specifications. I'm having a hard time with this. I mean, I tried a lot of cases before and I've seen a lot of cases tried. And if you've got millions of pages, you're supposed to look at them all before trial. And you should have had someone who said, you know what, that statement wasn't right and we can kill him with it. You know, I don't I don't get this. And I also am having a hard time with the notion that we're supposed to second-guess the trial court who was there and who saw and who had an ability to assess your ability to address these questions. The trial court did not, in its opinion as to our motion for new trial, separately address the Kerwood mill print issue. And we believe that's a separate ground to reverse and order a new trial. Again, that's a misrepresentation about the quality of that product and where that product went. The order on a new trial was silent as that only addressed the temperature data. Why don't we talk about the substantial evidence as it relates to the minimizing cross-linking. Yes, only one limitation was disputed at trial and that was the minimizing cross-linking limitation. The overwhelming evidence proved that Westlake not only practiced unembodiment of the 163 patent, but indeed practiced the preferred embodiment. What evidence, you say overwhelming evidence, but I was having a hard time pinpointing it. So what evidence do you believe supports your conclusion that the jury could not reasonably have concluded that you didn't sufficiently demonstrate that? The Jordan's Declaration, which I believe Joint Appendix 10012 in the related testimony, this is a declaration by their own engineer which parrots the words of the 163 patent and uses the very same words to describe a commercial run of one of their accused products. In that, he testifies that they do use an inline process, which is the preferred embodiment of the 163 patent. He testifies that the temperatures of that commercial run were about 417 to 417 degrees. 417 to 473 degrees Fahrenheit converting from Celsius, which is commensurate with the temperatures in the preferred embodiment as well. Okay, yours is really more that you think that the accused processes would always necessarily minimize cross-linking. But Westlake submitted expert testimony that that's not the case. So are we supposed to say the jury didn't have the right to credit Westlake's testimony over yours? A jury always has the right to credit both parties' testimony. However, where the overwhelming weight of the evidence can only support one conclusion for a reasonable jury, that is where that conclusion should be drawn as a matter of law. Here, no reasonable jury could have found, given all this evidence, that they practiced the preferred embodiment. Did your expert do anything other than parrot the language of the specification? Our expert walked through every claim limitation and demonstrated their process, that the temperature of their process was in line with the... By saying, I see it here in the specification. But then there was testimony to the contrary, and there's also other parts of the specification that the jury could have relied upon to disagree with that conclusion. Based on the Jordan's Declaration and the plant layout and all the evidence we had, everything about their accused process lined up with the preferred embodiment of the 163 patent. Their evidence was that they additionally filtered out, by use of what they call a screen pack, at the end of the process, additional gelled or cross-linked material. But it's Hornbook patent law that if you have a claim on a pencil, you do not avoid infringement by adding an eraser to that pencil. A filter on the end of the process is just an additional element. The fact that they were using an inline process, minimizing oxygen exposure, using nitrogen purges throughout the process, and controlling temperature, such that the Jordan's Declaration lines up with the temperatures in the preferred embodiment. But the problem is that they had testimony that they didn't minimize. They presented testimony that their heat in that one single day's worth of data was too high. Suppose we reject your contention about the misrepresentation. Do we then find that there's substantial evidence to support the verdict of non-infringement? I believe you can, yes. Because as to the Jordan's Declaration and other runs... We can't affirm? I believe that we are entitled to judgment as a matter of law. I don't understand that. If we reject your misrepresentation theory, isn't there plenty of evidence supporting the verdict on infringement? I do not believe so. Again, the major argument was the screen pack argument, which is, again, sort of something tacked on in. It's an additional feature. They also said that the process itself, before the end, was not minimizing cross-legging for a variety of reasons. It was minimizing cross-legging. That's what they said. But they said it was minimizing cross-legging because... That's the problem. When it comes here, that's what they said. That's substantial evidence. Generally. Why isn't it? I mean, they gave a significant amount of testimony that their process didn't minimize cross-legging and that they had the tactless procedure on at the end to eliminate the cross-legs. The three arguments they made were all overwhelmingly... I'm not speaking... overcome at trial. The screen pack is not a viable argument. But overcome with only your references to the specification, right? I mean, you didn't have any other independent evidence. No, I don't disagree with that. We did have all of the evidence about how their plant operated, their own engineer's declarations about how that plant operated. Do you define minimizing cross-legging as any minimal reduction at all, or is there some measure of reduction that's needed? This report correctly defined it as plant in order meeting, which in the context of the patent, it talks about in column four, less cross-legging, and in column six provides a quantifiable measure of the cross-legging obtained when there's a test called test one in the patent measuring gel counts. Gel counts is cross-legged material. It shows that cross-legging is reduced against the control, which is the conventional process. I will save your time for a moment. Yes, Your Honor. Mr. Josepher. Good morning, and may it please the court. I'd be happy to take any and all questions on the non-infringement side of the case. Well, here's one question. Suppose we were to agree with you hypothetically and agree that the judgment of non-infringement should stand. What do we do about the invalidity issues? Do you care about them at that point? Yes. I know sometimes they have more practical importance than others. We do. Why? Pardon? Why? There is a court-ordered mediation in terms of which are confidential, but the point is that we are concerned that they could still try to sue again on the same patent. Okay. I can't. I'd like to give more on that, but I can't. Let's jump in then to the on-sale bar. I'm having trouble understanding how Plum Tree can allow an offer for sale and then a reduction to practice pursuant to that offer. I'm talking about the second step of Plum Tree and how there's two kind of things laid out. How there could be any difference between that and a situation where 345,000 pounds of something is produced and then there's an offer for sale. Help me understand how Plum Tree could permit possibly one to amount to an on-sale bar and maybe arguably not permit the other. This is a friendly question. I completely agree. You've been pausing long enough, so I think that I wanted to help you. Which is greatly appreciated, obviously. Right. The point of Plum Tree is there are a couple different prongs there, and one of them is using the claimed method for commercial use. And here you're talking about commercial use produced an enormous amount of product that then before the critical date was offered for sale and then to the extent that matters immediately after the critical date was in fact delivered to complete one of those offers for sale. I'm having trouble. I read the material on the record that you cited. I spent quite a bit of time looking through it. What exactly were the offers? You say there was an offer to Pactiv and an offer to Cryovac. When did those offers take place and where do we find them in the record? The exact offers, what we have in the record is two things. We have emails, these internal emails that reflect the fact that offers had been made, and then we have witness testimony that doubles down on that and it says that the offer that had been made, we had decided to fill that. How was the offer made? Were the offers made orally, in writing? What are we talking about? The testimony about Cryovac is that there was, quote, always an outstanding offer there because it made regular purchases pursuant to an outstanding offer. I agree the record is vague on the actual underlying offers. The reason is that... Clearly under Plumtree, where you have to have an unequivocal offer to sell a product that is made pursuant to the method, you can't satisfy that from Plumtree. You can't show what the offer said. Obviously, if they were selling pursuant to older offers and those older offers were for the prior process, the product pursuant to the prior process, you're not going to be able to point to an unequivocal statement that, in fact, they were going to produce pursuant to this other process. We agree. We're not saying that the customer was told what process was going to be used to make the product. In fact, the testimony in the record was that the customer couldn't care less. I mean, they chose not. This came up in secondary considerations. Plaintiffs chose not to inform the customers that there was a new method. Clearly, the customer just cared about the product, and they've been getting the same product all along, so they didn't care about the process. And you're not saying that there was somehow a requirement that the new process had to be used? No, the decision was that it would be used. So it's the same as in D.L. Auld, or the same posture as in D.L. Auld or this court's more recent decision earlier this year, and the recent case in medicines against Aspire, the latest version of that. But the problem is this, that in order for an offer of sale to count for the on-sale bar, it has to be an offer that, if it were accepted, would obligate the offeror to provide the product. And that's, it seems to me, part of the difficulty here. First of all, we don't even know what the offer is, and why is it that the offeror here, whatever it might have been, obligated them to provide the new product? Well, because it was an offer to, two things. One, it's an offer to sell product, and it's the same product that's always been. But the product's not the patent. Right. The method is the patent. That's why it's just like D.L. Auld or medicines against Aspire, where what's being sold is a product. But for medicines, it wasn't a method claim. I thought it was. No. And clearly, in fact, that was a big point in the en banc medicines case, where we said all those cases that they're relying on are very different because they're method claims. Right. I was afraid it was a product-led process claim. But we have Skoltech, we have other cases that if you have a patented method and you offer to sell a product made by a patented method, that can be an on-sale bar. And that's what you're talking about here. But what I'm struggling with is where's the evidence that you, for the critical data, where the patentee made an offer to sell a product made by the patented method? In other words, your problem arises from the fact that here there are two products, one of which is made by the patented method and one isn't. And there doesn't seem to be any evidence that the purchasers cared one way or the other. But nonetheless, if there was an offer to sell a product made by the patented method before the critical date, the cases suggest that there would be an on-sale bar. But I'm just struggling. Where's the evidence in the record that such an offer was made? Well, there are two things. I think the first, fundamentally, there's one product. It's just like the DLL. The product was an emblem. There's an older way to make it, a newer way to make it. The question for the on-sale bar was, did the offer relate to product made by the older method or the newer method? And although you're right, in the case of product-led process, it's similar. Which process was used to create the product was the issue that this court commanded for fact determination on in the other case. And it's the same point here. It's one product. It could be made one way. It could be made the other way. Before the critical date, was there an offer to sell the product that would have been made by the patented method as opposed to the other one? Customer knowledge is irrelevant. Customer knowledge is irrelevant, but you also do have to have a situation where the acceptance of the offer would obligate the patentee to provide the new product. And that's the difficulty here that I'm seeing because that could be manifested in a variety of ways. But what is the evidence here that the patentee was obligated to provide the new product, that the customer could have complained that they didn't provide the new product? Do you agree that the patentee has to be obligated to provide the new product? That doesn't seem consistent with the plummetry second prong, but if you want to agree with Judge Dyke, feel free to go ahead. I was going to say two things. One is just on the facts. I think on the facts, our fundamental disagreement here is whether there's two products or one. So why did you say it was a summary judgment case? You both said there are no material issues of fact. And now we've got a situation where you say, well, all they had was this new process, and they were making everything with this new process, so definitely they were going to sell it. And yet we know that days before this delivery, that they delivered the old product. They delivered the old product after the critical date too, right? Well, after the critical date, they were out of bulk supply. A week before the critical date, they shipped the last real product. Well, they were a third plant, right? But they were still producing at other plants. There are different plants doing it different ways. But the point is... So they could have shipped from any plant. But they had decided. The important thing is for these offers for sale for these customers. I guess I don't really understand why you guys both said this was a summary judgment case. It didn't make you overreach. I was going to say, I mean, you know we're arguing both ways. If the court thinks there are genuine disputes of fact, that's not a basis for affirming summary judgment, right? That's a basis for reversing and remanding. Well, except for if we find that you waived that argument. Well, no, because we opposed their summary judgment motion. I mean, we did say... No, you filed a cross motion for summary judgment. Right. And you agreed that there were no genuine issues of material fact. Right. Which is our view... And you have never said to the trial court or to this court that there are genuine issues of material fact. And yet you're standing here saying, well, it's really a debate over the facts. Well, our brief in this court did squarely argue that if the court thinks there's a material dispute of fact, not a basis for affirming summary judgment, we're mandating a trial. But you didn't tell that to the trial court. Right, because we don't think that there is. We think the facts are unambiguously with us for two reasons. One, there is an outstanding offer for sale of the product. This is the one product. What's the offer? PX-3236. What is the offer? Where do we find the offer? Right. It's the offer that's relevant. I mean, you're right. The proof that's in the summary judgment record, it's the e-mails for Cryovac. An e-mail to Cryovac? No. Well, there were internal e-mails describing offers to Cryovac and offers to Pactiv. And there was then, with respect to Cryovac... I don't think the specific offers made it into the record. Wasn't there no dispute that there was, in fact, an ongoing and open offer to Cryovac and that there was an offer to Pactiva? I just looked through the yellow brief and it repeatedly talks about how the offers didn't contain a promise to supply the news. They don't... ...offers that would satisfy in general. That's the thing. The amount of proof you put in depends on what's actually being disputed. And what was disputed between the parties was whether these offers were for products. The same product, PX3236, made by the one method or the other. I would think it would be sort of interesting to know what the offer was exactly, right? Well, we know for certain it was obviously to sell the product. I agree there's a different component to the on-sale bar. It has to be... ...could be made by either of the processes. So the fact that you have an offer to sell the product where you've got two different processes does not equal, I have made an offer to sell the product by the new process. And that's your problem, is that you're saying that we should conclude as a matter of law that the mere fact that they had some product that was made by the new process stockpiled is the end of the inquiry. Well, no, it's more than that. What we're arguing, and it's the witness testimony for both, the witness testimony was that they had decided before the critical date to fill these offers with product made by the patented method. And it's their witnesses. So, first for Cryovac, it was the testimony of Equistar's own Jasmine Mehta who testified that by August 24th, 10 days before the critical date, the quote, decision had been made to ship LaPorte-produced material from the patented method. ...is they could have changed their mind. And if they changed their minds, the person to whom they were making the offer, even if it had been accepted, had no basis to complain that suddenly they changed their mind and decided to give them the old product rather than the new product. But, I mean, I think I'm agreeing with Judge Moore here, sorry to take so long to get back to you, that whether they would change their mind, it doesn't change the fact that there had been, at some point in time... ...to commercialize. Right, at some point. An offer for sale that's unfulfilled is still an offer for sale that triggers the on-sale bar, right? Exactly. You don't need any completed sale at all. Right? You need an offer. There's never been any dispute that the offer was definite enough. That's not disputed. You need an offer, and you've made the product, you've offered it for sale, and the decision, at some point in time before the priority date, had been made for both customers to supply product made by the patented method. And, in fact, wasn't there testimony that any orders out of Houston, there was nothing but the Laporta product available to ship to them? There was no more product made by the conventional method available to ship to Houston Road customers? Right. As of at least August 27th, the week before the critical date, there was no more bulk supplies made by any other method. In any facility or only Houston? What about DAMEO or DAMCO or whatever it's called? The testimony was a week before, at least for these... They had that one car left from DAMCO that they shipped on the 28th, but that there was no more. That was the 27th, right? But, yes, there was a week to go, exactly. So then, at that point, though, what you've got is you've made a huge amount of this stuff. That's what you had decided you were going to supply. And then, to the extent that it matters, the day after the critical date, an acceptance comes in, and the next day they ship what they had decided to ship. Where does the record show that they could no longer supply the whole thing there? The... Sorry, it was their... It was Equistar's vice president, Mr. Opasek, testified that they had run out of... What page are we on? Sorry, I don't have the page number. It's the testimony of Opasek in the record. I'm sorry about that. But what he testified was that they had run out of PX-3236 in bulk, so it would have to be the AU, which is the product-by-the-patent method, as of August 24th. And then, a few days later, they discovered they still had one railcar that shipped it, but then they were back to where they had been when Mr. Opasek... Page 3067. Thank you. But the... 3067. I think that might be the testimony you're looking for. I just got a note saying 3067 as well, so... That's because you heard me say it. Why isn't the creation of bulk products just mere pre-commercialization activity? Just creating the product standing alone would not be an on-sale bar because there's no offer for sale or sale. We agree with that. The point is that there was an offer for sale to make, to supply PX-3236. Never been disputed. Which, also, there's no dispute that it could have been made by either method, and had historically been made for these same customers by the old method. Agreed. So then the question is, though, if it could be made... This is the same fact question that arose in the other cases I mentioned. Okay, what was being offered for sale was made by the one or by the other. And the testimony in the record is, first, their witnesses testified that as for both of these two customers, the quote, decision had been made. In those other cases, it was important that you were talking about a sale of a product. So you were offering a product, and there was only one process. Here, what we're talking about is a method, a process method. And the patent is for the method, not for the end product. We know that. So these are materially different facts than the cases on which you're relying. Well, DL-ALD is pretty close. It was a manufacturing method, was the patent. And what was offered for sale was a product that had previously been made by a different method, could now also be made by the new patented method. Right, but the offer there said, we're going to make it by this new method, right? I don't think, I don't remember the offer in DL-ALD being that specific. But the point, though, is simply that it's a fact question. You know, the fact question is, okay, the product that's being offered for sale was made by the one or the other. Okay, it was a new fact question for you. It was not a fact question before Judge Moore asked if it was a fact question. No, it's always been a fact question, our point. No, we never told the district court that. You said, cross-nation for summary judgment, there are no material issues of fact. I'm sorry, what I meant by fact question is I didn't mean to say that we think it's disputed. I meant to say that we, there is a fact question and we think the record is unambiguously in our favor. Let's come back to 3067. I see that it says that they weren't making the old product in the LaPorte facility. So if we're going to come from LaPorte, they couldn't do it. Where does it say here that it couldn't come from another facility? There were more than one facility making this stuff, right? Right. Well, what you test, so it's on page, I mean, 3677, transcript page 192, starting at line 14, and Ms. Mehta says in this email, any orders for PX 3236 in bulk will have to come out of LaPorte, correct? Yes. That refers to LaPorte, yes. So the point was, for this customer, they had decided, going to ship from LaPorte, what they had in LaPorte was made by the newer method. Well, decided and have to are not the same thing. That's part of what we're talking about here. Are you contending that the order had to be filled from LaPorte, or just that they decided to fill it from LaPorte? Well, I think it's both. Mainly, we're saying they decided. They decide what they're offering for sale. What they're offering for sale is something that you've met a customer for. Where does the record tell us that they were compelled to fill from LaPorte? Compelled? Well, the compelled, well, okay. Sorry. I meant to say that if it's from LaPorte, they're compelled because that's all they have. You're right. It doesn't, I didn't mean to say that the record says that they were compelled to provide it from LaPorte. But the record accepts that, you know, Meta says that that's, will have to, I mean, it does. Paul, any orders for PX 3236 in bulk will have to come out of LaPorte. That's the testimony, and again, page 192, it's in line 16. So that says it will have to come out of LaPorte. She also said that the decision, quote, had been made to ship that from LaPorte, which means that they had decided before the critical date. The decision, the internal decision to provide one or the other is not something that could be enforced by a purchaser. That's the problem. If the purchaser,    it has to be an offer that if it were accepted, it would obligate the purchaser to provide that on-sale bar to the purchaser. That's the problem. If the purchaser has to obligate the package to provide the package product right here, the product made by the package message, can, no? I don't think so. I mean, no, because for a couple reasons, and Judge Moore's going to probably maybe add a third in a minute, or first if you want. But the, there are a few things about it. One is, you still, the commercial, the production of this vast amount of material with the intent to sell is a commercial use under, of the method. Was the method ever disclosed to the public? Was the method ever disclosed to the public? No, but that's the real point  Remember, the whole point of the on-sale bar is to enforce the basic patent bargain, which is, But that's not the only point. There are various purposes behind the on-sale bar, and one of which is to make sure that something, a patent, that has been disclosed to the public, either because the method's been disclosed, or the product has been delivered, and that product could be, that someone could figure out the method based on that product. That until those things occur, there's nothing being put out in the public domain. Right, but as this group pointed out in D.L. Auld, the other very important purpose is that you don't want people to keep things as trade seekers for years, and only when they happen to leak out, then seek an additional 20 years of a patent. The basic part of the patent bargain fully at issue here. That didn't happen here. Well, it did in the sense that they were using this method for commercial purposes for more than a year, and that's the line that Congress drew. We said in Medicines on Bond that the mere fact that there's some commercial benefit to stockpiling is not enough. Right, you also need an offer for sale. It has to be commercialization within the concept of the UCC. And making bulk product to sell, and then making bulk product to sell with outstanding offers to sell, which then right after the critical date you deliver on, is that. It's an important point that the non-disclosure to the public, I mean this court said it's irrelevant, but that's why it's irrelevant is that it's actually important. You can't have a situation where someone just sits on it. Were there any new offers, outstanding offers, other than the ones that were historical, that were offers based on the old product? Well, the offers were, the thing about based on the old product, I mean the offers were for these two customers, or the two that are in the record. Pardon? The offers that are in the record are for these two customers. Except the offers aren't in the record. But they're referenced in the record and it's undisputed. This is the point. No, they're saying there had been an historical purchase, a history of purchases by this one client. But you don't have anything that says that there was an   Why don't you look at 3123? That's the e-mails, right? I mean that's the e-mails, is the reference there. And then the witness testimony referenced it as well. Going to 3123. Seems like it has a quote, a price, it's been approved, number of years that the agreement would be approved for, no rebate terms. It seems very precise. Yes. And there hasn't been a dispute that this is the offer, right? They've never once at any point below or on appeal disputed that this was an offer. Exactly. And this is the thing. There's simply never been a dispute, as you said, on these points. And so the dispute has generated a genuine issue of fact as to the key point of exactly which method would be used for the outstanding offers. And again, it's not just here, it's there in brief as well, our point is pretty simple, that one, we think we're entitled to judgment on the undisputed record, but if not, the other side certainly isn't. You can't affirm based on perception of fact disputes. Okay, thank you. Thank you, Judge. May it please the Court. Judge Morris, one of your questions about whether the second prong of Plum Tree is satisfied, it's not  The record is undisputed that the patented process was only performed once before the critical date, and that was the second prong of Plum Tree. Actually, two batches were made, not once, it was performed twice, because two batches were made totaling 345,000 pounds, so it was performed twice for two batches. Each time results in a batch. Two lots were made on the very same day. The process was performed twice. The process was performed continually for a span of a few hours over a day, and two production lots were made out of that. And an average sale is about 47,000 pounds, is that correct? That's correct, but under this... That's a lot of product, that's almost 10 times the average bulk sale that you make. That's how much you produced. It seems like a lot for a test run. Well, the thing is,  commercial reactor was massive. They produced a lot of material, and to get it out of a wide spec into a in spec run and get enough material out that they could test it, again, on a commercial-sized reactor, which was the purpose of the invention, to bring two processes to the commercial reactor. It made sense that they produced that much. Then they had to test it. They tested that over the next few months and eventually reached the conclusion that it not only produced acceptable product, but even better product. When did they reach that conclusion? The presentation was made between the first and the second days. I don't understand what all this has to do with the on-sell bar. It doesn't make any difference whether they produced the stuff for testing or experimental use. It doesn't make any difference whether they   for  use. It doesn't make any difference whether they produced it for experimental use. It doesn't they produced it for  use. It doesn't they produced it for   It